### O'BRIEN BROS., Inc., v. CITY OF NEW YORK et al.

### AMERICAN SUGAR REFINING CO. v. SAME.

District Court, E. D. New York. June 13, 1928.

Nos. 6304, 7154.

1. Collision ⬅18—Act of steam tug in casting off lines of barges moored at bulkhead, to take out dumper, held proximate cause of accident resulting, when barges went adrift.

Act of steam tug in casting off certain lines of barges moored at bulkhead, in order to take out dumper, also moored at bulkhead, thereby imposing unusual strain, *held* proximate cause of accident resulting, after barges went adrift.

2. Collision ⬅70—Moored ship held entitled to damages sustained in collision with drifting barges.

Ship moored at dock without motive power *held* entitled to recover damages sustained in collision with drifting barges.

3. Admiralty ⬅122—Respondent, impleading one found without fault, is liable for costs to such party.

Respondent, having impleaded party found to be without fault, is taxable with costs to such party.

In Admiralty. Separate libels by O'Brien Bros., Inc., suing in its own behalf and in behalf of the crew of the steam tug O'Brien, against the City of New York and the scows J. J. McGuirl and Subway, and by the American Sugar Refining Company against the City of New York, wherein the Shamrock Towing Company, Inc., and others, were impleaded on petition of respondent City of New York. Decree in accordance with opinion.

J. A. Martin, of New York City, for O'Brien Bros., Inc., and Bouker.

W. J. Leonard, of New York City, for City of New York.

Peter Alexander, of New York City, for the Shamrock and the J. J. McGuirl.

J. R. McMullen, of New York City, for the Subway.

C. Palmer, of New York City, for Jay Street Terminal.

A. J. McElhinney, of New York City, for American Sugar Refining Co.

CAMPBELL, District Judge. On stipulation the two above-entitled actions were tried together, and, as each forms a part of one transaction, one opinion will be sufficient.

In each of the above-entitled actions the Shamrock Towing Company, Inc., the Bouker Contracting Company, and the Jay Street Terminal were impleaded on the petition of the city of New York, under the fifty-sixth rule in admiralty, and in the first above entitled action the respondent the city of New York was, on the petition of Cleary Bros., Inc., owners of the deck scow Subway, impleaded under the fifty-sixth rule in admiralty.

The Shamrock Towing Company, Inc., was under contract with the city of New York to tow deck scows containing city refuse from certain specified points to certain specified points, including among them Riker's Island. On March 19, 1924, the steam tug Erin, owned by the Shamrock Towing Company, Inc., took in tow at Fifty-First street, North River, two D. S. C. loaded scows and two loaded scows chartered by the city of New York, the tow having been made up by the steam tug May McGuirl in the following manner: Two tiers of two boats each, the D. S. C. No. 8 being the starboard boat, and the Subway being the port boat in the head tier and the J. J. McGuirl being the starboard boat, and the D. S. C. No. 43 being the port boat in the last tier. The scows were all towed stern first.

The Erin proceeded with the four barges in tow down the North River and rounded into the East River, and when about opposite Fourteenth street, Manhattan, swung the tow around and landed it outside of other boats at a private bulkhead running from Fourteenth to Fifteenth streets. The light dumper No. 73H of the Bouker Contracting Company was moored at the bulkhead, and to the north of the dumper was moored a digger, abreast of which was the light scow Julia McGeeney; the beam of the dumper being about equal to the combined beams of the digger and the Julia McGeeney. The McGeeney was not close up to the dumper.

The Erin's tow was properly made fast, by putting a line from the port side stern bitt of the D. S. C. No. 8 to the quarter bitt of the No. 73H, a line from the port bow bitt of the No. 8 to the No. 73H, and a line from the port side bow bitt of the J. J. McGuirl to amidships on the McGeeney, and the Erin left.

Some time thereafter the steam tug Bouker No. 6, owned and operated by the Bouker Contracting Company, came in to take out the dumper No. 73H, and requested the captain of the No. 8 to let go his lines. This he refused to do, and a deck hand from the No. 6 went aboard the No. 8 and cast off the lines between the No. 8 and the dumper.

[1] The No. 6, in taking out the dumper, caused the four scows to swing out in the stream, putting all the strain on the port side bow bitt of the J. J. McGuirl, which, as a result thereof, loosened and the line parted. The Bouker No. 6, observing this condition, then pushed the scow Subway toward the bulkhead, and a deck hand from the No. 6 took a line from the No. 8, carried it along the deck of the dumper, and threw it to a man on the bulkhead, who put the eye thereof over a mooring post; the other end being made fast on the port side stern bitt of the No. 8. The No. 6, with the dumper in tow, went away, leaving the four scows hanging on the one line.

The tide was flood, but, due to the wind, the tow did not set up the river, but tailed out, and it was impossible to get out any other line. Some time after the No. 6 left the tide changed, the tow swung around, and the Subway passed the bight of a line to a man on the bulkhead, who put it over a post, and the line was made fast on the Subway.

About an hour and a half after the Subway's line had been made fast on the pier, the line of the No. 8, which was a practically new 5-inch line, parted, leaving the whole weight of the tow on the line from the Subway. Some time after this the post on the bulkhead to which the Subway's line was made fast broke, and the tow of four scows went adrift and down the river.

Off Wall Street the tow passed near enough to the shore for the Subway to throw a line onto the dumper Sea Cow, which was there made fast to a dock. This stopped the tow for a short time, when the Sea Cow and the tow of four scows went adrift.

About 11:15 o'clock p. m. on the 20th, the steam tug John J. Arbuckle, which was owned and operated by the Jay Street Terminal, docked a car float, went out in the river, and picked up the five drifting scows, and tied up the four scows in the tow at the end of Pier 4, Brooklyn; the No. 8 being alongside the end of the pier, and somewhat less than one-half of the McGuirl being along the end of the pier, a part of the tow thus being across the slip. The tow was made fast by a line from her port side stern bitt to the pier, with a lead of about 15 to 20 feet, and the captain afterward put out another line to the pier from that bitt, and by

a line from the south corner of the pier on the port corner of the McGuirl leading upstream. These lines were furnished by the D. S. C. No. 8 and the McGuirl, respectively, and not by the tug.

The tow was safely made fast to withstand conditions ordinarily to be expected, and to the satisfaction of the captains of three of the scows, one of which had no captain aboard, and so signified by them when they were called to the pilot house of the Arbuckle by her captain. No obligation was placed upon the master of the Arbuckle to examine the support of the bitts on the No. 8.

For more than four hours the tow remained safely moored at the pier during the greatest force of the tide, which had changed to flood, when for some unexplained reason the line of the McGuirl parted, and the whole weight of the tow was cast upon the lines from the No. 8.

The bitt on the No. 8 gave way and the whole tow drifted up the river, D. S. C. No. 43 still forming part of the tow which had not broken up, and on the morning of March 20th the inner port corner of the D. S. C. No. 43 struck the starboard stern corner of the barge Brazil, which was moored stern out on the south side of the pier at the foot of South Second street, Brooklyn, causing considerable damage. The tow then continued to drift up the river and was picked up by the steam tug O'Brien, which safely landed the four scows at North Tenth street, Brooklyn.

The service rendered by the O'Brien was a salvage service, but not of a high order of merit, nor involving any great risks, but largely a towing service in the harbor, and did not occupy more than a half hour's time. The Erin left the tow properly tied up at Fourteenth street, with the intention of returning and taking it up through Hell Gate, on the proper stage of the tide for that navigation, the following morning.

The Bouker No. 6, in taking out the No. 73H at Fourteenth street, did not leave the tow securely made fast, but subjected it to a great strain in the way it took out the dumper, and left the tow all on one line from the port side stern bitt of the No. 8, and subjected that bitt to an unreasonable strain.

The lines on the scows were good lines and the bitts that were used were in good condition. The captains of the scows, so far as the evidence shows, did all in their power to get out lines, and the Bouker No. 6 is solely to blame for the tow going adrift at Fourteenth street.

I believe the witnesses on behalf of the Arbuckle, that the slip was filled, and I see nothing to complain of in the way that the tow was made fast, which not only was approved by the master and mate of the Arbuckle, but by the three captains of the scows.

The cause of the parting of the line of the McGuirl at Pier 4 has not been explained, as the captain could not be found, but the line was a good line and had also been strained at Fourteenth street. Even the parting of that line, however, would not have caused the tows to go adrift, had not the bitt, on the port side at the stern of the No. 8, on which had been imposed the heavy strain at Fourteenth street, broken out.

It is true that the four scows did not appear to have suffered any damage up to this time, and they had made fast to the Sea Cow and brought her with them, and they had also been made fast at Pier 4; but none of these things were the cause of the tow going adrift from Pier 4, but that resulted from the breaking out of the bitts.

That the bitt was in seaworthy condition, when the Bouker left the tow hanging on one line from that bitt, seems to have been amply shown by the results, and no reason can be assigned for its breaking out at Pier 4, except as a result of the strain which had been put on it at Fourteenth street.

Obviously the Bouker No. 6 was the agency that set in motion the successive steps leading up to the damage to the Brazil by the D. S. C. No. 43, with the other boats all made fast with her in the tow coming into contact with the Brazil, and the salvage of the scows by the O'Brien, and I have been unable to find faults of the scows or their captains, or of the Arbuckle or her master or mate, which relieve the Bouker No. 6. If the fault was in the lines, or in the manner in which they were made fast at Pier 4, there would be some argument; but the fact seems to be that, not only the expert navigators of the Arbuckle, but the experienced captains of the scows, believed at the time that the tow was properly made fast at Pier 4, and that would seem to be established by the length of time and change in the condition of the tide while the tow remained at the dock. It was the breaking out of the port side stern corner bitt that was responsible for the boats going adrift, and it seems to me to be a reasonable inference to be drawn from the evidence that the bitt broke out because of the unusual strain that had been imposed on it at Fourteenth street, and that the act of the Bouker No. 6 in imposing that

strain was the proximate cause of the accident.

[2] The Brazil was moored at a dock without any motive power, and is entitled to recover the damage she sustained. Some question is raised as to some of the scows being without anchors, but that is not alleged as a fault in the libels or either of them herein, and there is no evidence that anchors could have been successfully used under the conditions of wind and tide.

A decree may be entered in the first above entitled action in favor of the libelant O'Brien Bros. Towing Company, Inc., against the Bouker Contracting Company, for $300, to be divided, two-thirds to the owner and one-third to the master and crew, in proportion to their respective wages, with costs, and in favor of the city of New York and the scows J. J. McGuirl and Subway, dismissing the libel without costs, and in favor of the Shamrock Towing Company, Inc., dismissing the libel and petition without costs, and in favor of the Jay Street Terminal dismissing the libel and petition with costs against the petitioner the city of New York.

A decree may be entered in the second above entitled action in favor of the libelant the American Sugar Refining Company against the Bouker Contracting Company, with costs and the usual order of reference, and in favor of the city of New York dismissing the libel without costs, and in favor of the Shamrock Towing Company, Inc., dismissing the petition and libel without costs, and in favor of the Jay Street Terminal dismissing the petition and libel with costs against the petitioner the city of New York.

I see no reason why the salvors should be charged with costs to the boats or the owners of the boats to which salvage services were rendered, although the libel be dismissed as to them, and there seems to be no reason in either action to allow costs to the respondent impleaded Shamrock Towing Company, Inc., because it was by one of their tugs that the boats were taken in tow and left at Fourteenth street, and the city of New York should not be charged with costs, because it brought in that company, to which it had intrusted its scows for towage.

[3] There was no privity of contract between the city of New York and the Jay Street Terminal in either action, and therefore the city of New York, having by petition brought in the Jay Street Terminal, which has been found to be without fault, costs to it should be allowed against the city of New York.